Case number 19-7006 Samuel Pierce, appellate v. Yale University at Elm Mr. Pierce is the appellate, Mrs. Temple is the applicant Let's wait until the courtroom clears. Alright, Mr. Pierce, good morning. Good morning, your honors. May it please the court. I first wanted to note important development that's occurred since the close of briefing in this case related to law in this area. On September 28th, 2019, the Wall Street Journal reported that college admissions group votes to allow more aggressive student recruiting. Changes come amid threat of continual legal action by the Justice Department. One of the major changes in the undergraduate admissions policy covered by this vote eliminated a section that discouraged pursuing students after May 1. And this this incident case concerns the medical school's policy. The medical school's May 1 policy is far more restricted for students because it has an actual enforcement mechanism, among other reasons. An actual electronic crosscheck that should make it even more vulnerable to antitrust liability than the undergraduate case. Can I ask you just the mechanics of your theory of conspiracy here? So you say the conspiracy is the schools are sharing information about where candidates, where else candidates are admitted. So Yale knows that a lot of their candidates are also admitted to Harvard and a lot of them may go to Harvard. So they take that into account. Right, exactly. Why would it be the case that if Yale Medical School wants 80 students per year, and they lack the information that they're getting pursuant to what you say is the antitrust conspiracy, why would they admit way more people? Why wouldn't they just proceed more cautiously and do rolling admissions if they're in a world of uncertainty and they want 80 people? They just adjust the timing of the admissions offers to end up with 80 people. Well, I think by not having a market where it's competitive and you don't know what your competitors are doing, you have to be more cautious in the sense that you have to admit more people, because it may be the case that everybody Yale has admitted has also gone to Harvard or gotten into Harvard and gotten into Penn. Most or all of those students would prefer to attend another university. It's hard to imagine that Yale Medical School can't fill 80 slots. Well, exactly, but they can. Instead of extending 400 offers of admission, they might have to extend 800. And I think that's actually not unreasonable at all, because the yield rate already for Yale School of Medicine is around 20%. So for every five offers that they send out, only one of those students chooses Yale already. So by having a relatively small expansion, by having the yield rate go down by a relatively small amount, you're still a significant number more students are going to be admitted every year to Yale. And so I think that it's also the fact that the universities have to plan more capacity based on the uncertainty, because if they don't know how many students are going to choose their offer, then they might have to plan more of a buffer. So they're going to end up admitting 90 or they may end up with a class of 90 instead of 80. And they're more likely to end up with that. So I think that's the reason that they end up admitting significantly more. And as I've suggested in the briefing, even if it's one more, which certainly wouldn't seem to be a stretch, just as an extra buffer in an environment where you don't know what your competitors are doing, that should be still enough to state a cause of action. So that's why I think that there's a definite predictable effect on the overall number of acceptances, that it's going to be way up. One more question, a legal question, which is, if we accept the distinction in the case law between educational judgments and economic judgments, why is the decision of Yale Medical School regarding how large a class size to have, why is that economic rather than educational? I can imagine a lot of schools just wanting and deciding to be small schools because they think there are educational benefits to that. I think there's a lot of things that go into what size of a class you ultimately have. One of the major ones is what your resources are at your school. So, yeah, in the long term, you're going to direct your resources based on, in part, your educational judgments. But I don't think that that means that you can assume that students aren't going to have more options, too. It's not just, it's not purely the number of students in the class. It's also the choice of students. And that's what I think the Justice Department is concerned about in part, too, where you have a scheme like this, it's not necessarily that you have more students admitted, because, again, I think they're subject to capital constraints and other budgetary constraints. I can imagine, obviously, economic justifications for the decision to set the class size at 80. Right. But I can imagine educational ones as well. Right. So, I mean, in that circumstance, you would think that... So, if we're applying Brown and Hamilton and Marjorie Webster... Right, right. Well, I mean, I think that you should overrule. I mean, Marjorie Webster should probably be overruled. It's probably not the current state of the law with antitrust. It's been expanded a lot in terms of what you think about FTC versus Federation of Dentists. Assuming it applies. But even assuming it applies, I think that this is not a context where you're talking about a policy where you should really be deferring to medical schools. In that case, if it was something about the number of credits that you have to obtain to get the degree or mandating a certain standard for whatever it is, hours of surgical experience or whatever it is, then I think that's an example of a pure academic policy where maybe you should give more discretion, maybe not as much as the universities would want. But in this case, I think it's really a much more... It's not really a policy. It's kind of the end result of a complex market process where providers of higher education market interested students. So, yeah, I mean, I think that it's absolutely an area that's important enough to be considered, you know, under the antitrust laws, under free market principles. Because there are very significant effects, I think, from, you know, a restraint between two schools or more schools. And I think that you should seriously consider the fact that the student's choice of school is also very important. It's not... It is... I think with this type of policy, you are going to always see more higher prices, fewer overall number of admittances. But it's also the student's choice in being able to attend the university of their choice. All right. Thank you. Are you finished? Yeah, I'll reserve the remainder of my time for rebuttal. Thank you. Mr. Stemple. Good morning, Your Honors. And may it please the Court, my name is Scott Stemple. On behalf of appellees, Yale University, the trustees of the University of Pennsylvania, and the Association of American Medical Colleges. With me at council table is my colleague Noah Kaufman. This Court should affirm the decision below dismissing Mr. Pierce's complaint and rejecting his request for a mandatory injunction compelling the Yale School of Medicine to admit him because the admissions committee considered those candidates more qualified. It should do so for at least three reasons. But before we get to those reasons, to fully appreciate them, it's important to understand what this case is not about. This case is solely about the plaintiff, Mr. Pierce, and his rejection from medical school. The crucial question, and really the only question is, has he suffered an injury of the type the antitrust laws are designed to prevent? It's also about the district court's opinion. And you won below on a very broad ground that there is no antitrust scrutiny of a school's decision, not only a school's decision of which students to admit, but a school's decision of how many students to admit. So, Your Honor, I'm not quite sure that the decision is that broad. It was pretty narrow. That is what the judge said. What he found is that admissions decisions, who and how many, are not... Which and how many students to admit. ...are noncommercial aspects. How many is pretty hard to reconcile with modern antitrust. You can get to the same destination along several paths, and we actually identified three. Okay, but let's talk about this one. So I assume you would agree if all the Ivy League medical schools agreed to charge $100,000 tuition, that naked horizontal price fix would be subject to antitrust scrutiny. Clearly commercial, yes, Your Honor. So suppose instead all the Ivy League medical schools agreed to limit output, and Yale says we'll only do $80,000 and Harvard whatever, and that's a naked restriction on output. Antitrust scrutiny? And I concede that an express agreement to restrict output in that way would be subject to the antitrust laws. That's not the case. Okay, so why isn't this complaint, or the district court's reasoning, a variant saying just the opposite? He says the decision regarding how many to admit gets no antitrust scrutiny. Yes, he says that, but I don't think you need to rest on that conclusion in order to arrive at the same result. Okay, but let's talk about his ground before you get to alternative grounds. Are you defending that? So we are defending a portion of that in this respect. I do believe that the decision in a zero-sum game where at the time of applications, the number of seats in a medical school are fixed, so even if there's an output restriction, at some point in time, it's a game of musical chairs and the number of chairs are fixed. And then the question, and the only relief this plaintiff seeks, of the decision of the admissions committee that someone else is not a proper subject for antitrust scrutiny. That's half of what Judge Cooper concluded, and I will concede that his conclusion was stated in broader terms, but if you separate the choice of who gets in from how many, which I think you can do. You understand why I'm pressing on this. Yes, absolutely, absolutely. And I have some trouble understanding the precise mechanics of how the conspiracy alleged here actually leads to an output restriction. But that's a Twombly-Iqbal issue, and you didn't win on that ground. We didn't win on that ground. We raised it, and with all due respect to the court, when confronted with an eight-page brief raising one issue on appeal. I understand. We didn't address it. Frankly, I do think, though, the court can affirm for any reason, and even the district court was troubled. I believe he referred to the theory of harm that you've identified as highly conjectural, counterintuitive, and unlikely. But good enough for Twombly and Iqbal. Well, that leak, but good enough for Twombly and Iqbal is what we take issue with, because frankly, and I think you heard Mr. Pierce say it just now. If one more, his position is if Yale had increased its class size by more. I understand. I don't agree with everything he says, but he's not just, this is not the problem of picking A over, there's nothing more than picking A over B, and that's an injury to a competitor, not competition. He has alleged something more than that, something that he says is an output restriction. Something that he says is an output restriction, yes. And to your point, a naked agreement to restrict output would be reachable under the Sherman Act. We don't dispute that. Okay, so I've kept you on his ground. If you want to get to alternatives. So just back to what this case really is about. In paragraph 71 of his amended complaint, Mr. Pierce says what he wants from the courts, and I quote, there is no amount of money which can compensate the named plaintiff for the inability to achieve his dreams and career goals. The loss to the named plaintiff and to society from the underutilization of the plaintiff's extraordinary talents can only be mitigated and avoided by an injunctive relief allowing the named plaintiff to attend medical school at Yale. That's what he wants. And we think this is completely disconnected from the theory of harm, the antitrust injury. But, your honor, context does matter. And the context here is that the admissions committees for America's 154 medical schools perform an exceedingly important task. In this most recent application cycle, there were nearly 900,000 applications to U.S. medical schools, and only about 22,000 applicants actually enrolled. So that's over 40 applications per seat. I think we all recognize it's very difficult to get into medical school, especially a medical school like Yale. So the admissions committees have to decide who from among this large pool of applicants they will admit to their respective medical schools to be future physicians who will treat you, me, our children, our grandchildren. This is a very important task. Doctors are not on islands. They have to work in teams. If, God forbid, I walk out of here today and I get hit by one of those many news vans staking out the Roger Stone trial, and I get whisked away in an ambulance to a hospital, I don't have the luxury of interviewing the doctor in the emergency room when she starts treating me, or the trauma specialist, or the surgeon when they wheel me up to the operating room, or the intensive care specialist when they move me into intensive care. And all of them have to work together. So for this reason, in contrast to law schools and most other postgraduate programs, every medical student, would-be medical student, who a school identifies as a potential entrant will be interviewed. Everybody gets interviewed. Mr. Pierce was interviewed. He was interviewed at UCLA. He was interviewed at Hofstra. He was interviewed at Yale. And his contention is that as a result of the interview, that's why he didn't get in. That's when what? That's why he did not get admission. What? As a result of the interview. Yeah. He did not- Oh, I see. He was rejected. Oh, okay. Sorry about that. Yeah. So in our briefs, we mention three reasons, and I won't belabor them here, but for affirming below. And I think that Judge Katsas has identified a compelling fourth reason, which is the promulgation and the implausibility of the claim. But we believe that the decision of who, not how many, but who gets in is a quintessential non-commercial aspect of higher education. Second, in a zero-sum game, when the complaint of the plaintiff is, it should have been me instead of you- Both of those grounds go to the who question, not the how many question. Exactly. In that case, he has not suffered an antitrust injury. And third, you do mention the academic deference argument. I think that we propose it more as a prudential consideration, an important prudential consideration, especially when it comes to admission to medical school, rather than a hard and fast rule. Thank you. All right. Thank you. Does Mr. Pierce have any time? We have a few minutes left. All right. So I think it's really important to keep the merits of the antitrust claim separate from this appeal, because as Apple versus Pepper, which was the direct purchaser rule in the Supreme Court said, when you're considering a threshold antitrust issue like this, there's really no occasion to visit the merits. I haven't had the chance to put expert testimony before you and explain. It's a fairly complex market. Like they said, I think the statistic is not quite right. It's more like 90,000 maybe applicants for 22,000 spaces. But the point is that it's definitely something that falls within the grounds of the antitrust. And as far as the specifics of my particular admission, that's actually not the only relief requested in the complaint. I suggest that there could be money damages, various other forms of damages. And it's definitely not limited to injunctive relief. That's just a statement that legal damages are inadequate to justify one of many reliefs being injunctive relief. All right. Thank you. Thank you.
judges: Henderson, Tatel, Katsas